<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

|  |  |
|---|---|
| MICHELLE WILLIAMS, | |
| Plaintiff, | Civ. No. 08-5113 (DRD) |
| v. | **O P I N I O N** |
| CITY OF ELIZABETH, et al., | |
| Defendants. | |

*Appearances:*

by: Fincourt Shelton, Esq.
504 Main Street, Suite 100
Darby, PA 19023

    *Attorney for Plaintiff, Michelle Williams*

by: Daniel Antonelli, Esq.
2004 Morris Avenue, Suite 5
Union, NJ 07083

    *Attorney for Defendant, Johanna Rivera*

LONDA & LONDA, ESQS.
by: Felice Londa
277 North Broad Street
Elizabeth, NJ 07208

    *Attorneys for Defendant, Rodney Dorilus*

LA CORTE, BUNDY, VARADY & KINSELLA, ESQS.,
by: Robert F. Varady
989 Bonnel Court
Union, NJ 07083

*Attorneys for Defendant, City of Elizabeth*

**DEBEVOISE, Senior District Judge**

The present matter arises out of the arrest by Officer Johanna Rivera and Officer Rodney Dorilus ("Officers") of the plaintiff, Michelle Williams.  The Officers move, pursuant to Federal Rule of Civil Procedure 56, for summary judgment on Williams's 42 U.S.C. § 1983 claims for excess force, invasion of privacy, and failure to provide medical attention, and her common law claim for malicious prosecution.  Additionally, the Officers and the City of Elizabeth ("City")[1]— the municipality that employed the Officers—previously filed motions to dismiss Count Five, the claim for malicious prosecution, on jurisdictional grounds pursuant to Federal Rule of Civil Procedure 12(b)(6), for failure to comply with the notice provisions of the New Jersey Tort Claims Act.  The Court will consider both motions in the present opinion.  For the reasons stated below, the Court will grant Dorilus and Rivera's motions for summary judgment on all the claims against them.  Having granted the Officers' motions for summary judgment on the merits, there is no need for the Court to rule on their motions to dismiss on jurisdictional grounds.  The Court will deny the City's motion to dismiss on jurisdictional grounds.

## I.  BACKGROUND

On Sunday morning, November 18, 2007 at 12:15 a.m., the Officers were on duty as uniformed police officers employed by the City.  They were dispatched to assist Joshua Karp and his wife Elissa Karp, who are tenants of 801 North Broad Street #5D on the fifth floor of the building.

---

[1] Collectively referred to as "Defendants."

When the Karps came home late on Saturday night, they found a woman they did not recognize "passed out" in front of the door to their apartment.  (Joshua Karp Dep. 34:16, Mar. 11, 2010.).  The woman was Williams, the 25-year-old tenant of #8B on the eighth floor of the building.  She smelled of alcohol.  (Id. 34:23.)  Williams appeared to be wearing a pants suit, with the shirt up over her head so she was topless and was not wearing undergarments.  She may have been wearing the suit jacket over the shirt.  She was not wearing shoes.  (Elissa Karp Dep. 7:23-8:16, Mar. 11, 2010.)  The Karps assumed that she was "a homeless person that got into the building from the bus stop."  (J. Karp Dep. 14:24-15:3.)  They called the building superintendant but he did not answer so they went down to the lobby of the building and called the police to report a suspicious person.

When the Officers arrived at the scene and the Karps took them upstairs, Williams had not moved.  (J. Karp Dep. 37:8-38:15.) Rivera touched her shoulder and checked her wrist for vital signs.  (Johanna Rivera Dep. 65:8-20, Nov. 13, 2009.)  The Officers attempted to wake her up by calling to her, "[w]ake up, get up," for about a minute and she did not respond.  (J. Karp Dep. 38:24-39:15.)  Next, Dorilus shook her foot while Rivera touched her hand and tapped on her shoulder.  (Rivera Dep. 66:13-14.)  Williams still did not respond.  (J. Karp Dep. 40:14-21.)

Williams woke up suddenly.  The accounts of the incident offered by Joshua Karp, Elissa Karp, Rivera and Dorilus all concur in describing that as soon as Williams woke up, she began to flail her arms and legs, kick, and yell at the officers.

Joshua Karp observed:  "[s]he jumped up…it appeared to be someone who was highly intoxicated plus probably on a few drugs trying to get up."  (J. Karp Dep. 43:12-19.)  She started "[s]winging [her arms], [in a] windmill motion" and "kick[ing] her legs, like a baby temper tantrum."  (Id. 49:16-23.) The Karps retreated to the stairwell, which was "very close," about

"two doors from their apartment" for protection and observed the scene from there.  (Id. 13:14-15; 14:17-22.)  Elissa Karp observed that "[Williams] was running back and forth to our apartment door trying to open the door.  At that point they were just holding her to try to stabilize her."  (E. Karp Dep. 12:9-14.)  "She was resisting them, flailing her arms and legs, and he pinned her against the wall holding her arms down to prevent her from hitting him."  (J. Karp Dep. 19:17-20.)  The Officers informed Williams that she "had to come, she didn't live here."  (J. Karp Dep. 13:13-14.)  When "the officers told her that she had to leave [] she tried banging on the [Karps' apartment] door."  (J. Karp Dep. 13:11-12.)  "She was [] shouting and screaming for a whole bunch of the time."  The only word Joshua Karp could make out that she said was "bitch." (Id. 31:17-24.)  It appeared to Joshua Karp that Williams was "attacking" the Officers.  (Id. 51:12.)  Joshua Karp testified that he did not see either Officer hit Williams, but he did see her kick and hit them.  (20:10-16.)  "She got it together somewhat to where she was able to walk without the officers forcing her to walk.  Once they let go of her, she ran back to the door and started ringing the doorbell that we had and smashing on the door."  (J. Karp Dep. 14:12-16.)

According to Dorilus, "when she finally turned over…she attacked us." (Rodney Dorilus Dep. 73:15-16, Nov. 9, 2009.)  "We were never able to help this lady in any way….[s]he started kicking, punching, fighting.  When she turned over, it was a fight that we didn't expect."  (Id. 75:17-24.)  Rivera stated in the police report, "we advised Ms. Williams to calm down…or she would be placed under arrest for disorderly conduct."  (Antonelli Cert. App. B.)  At some point, she kicked him in the groin and punched Rivera.  (Dorilus Dep. 76:7-8; Antonelli Cert. App. B.) Rivera stated that she was "combative" and "began kicking and punching myself and my partner" and "flailing."  (Johanna Rivera Dep. 77:20-78:19.)  Dorilus recalls:

> I think she tried to stand up.  I don't remember exactly.  I think she
> was trying to get up.  It was a fight and she was trying to get away

> from us, I believe....She was fighting, constantly fighting, kicking,
> crawling, trying to bite.  She was acting like a crazy woman.

(Dorilus Dep. 96:16-22.)

When the Officers advised Williams that she was under arrest, she continued to fight and kick.  (Id. 97:5-10.)  While they were attempting to arrest her, Williams repeatedly tried to stand up, and they "took her back down."  (Id. 97:17-98:4.)  Dorilus struck Williams "to get her under control."  (Id. 99:22-23.)  Dorilus stated,

> She might have got struck in the face.  That wasn't the intended
> target.  I threw punches.  I wasn't intending to hit her in the face,
> but she might have got struck in the face.

(Id. 101:19-22.)

Rivera also testified that she struck Williams with her hands during the struggle.  (Rivera Dep. 81:16-25.)  Dorilus testified, "[w]e tried compliance holds with her, that didn't work.  We tried pressure points, that didn't work."  (Dorilus Dep. 99:23-25; see also Rivera Dep. 80:1-2.)  Dorilus described the struggle with Williams as "fierce" and "violent," and said that during the struggle, Williams was "loud and profane."  In the end, the Officers together were able to put handcuffs on Williams.  (Id. 102:17-103:22.)  Rivera's police report stated, "after a brief struggle we were able to complete the handcuff procedure."  (Antonelli Cert. App. B.)  To do so, they had to force her arms behind her back.  (Dorilus Dep. 100:14-15.) When they escorted her to the elevator, they had to help her walk.  (Rivera Dep. 81:5-6; Michelle Williams Dep. 98:5-6, Oct. 23, 2009.) The Officers completed a "use of force report," which stated that Williams had resisted police officer control and posed a "physical threat/attack" on a police officer.  The report states that the Officers used a compliance hold and hands/fists.  (Antonelli Cert. App. C.)

Williams's story differs from the accounts of the Officers and the Karps, mostly in that she does not recall kicking, flailing or yelling at the Officers.  On Saturday, November 17, 2007,

between about 6:00 p.m. and 9:00 p.m., Williams drank two glasses of wine and took about 300

milligrams of Seroquel, a sedative.[2]  Williams had not eaten for two days.  Around 9:00 p.m., she

went downstairs to visit an acquaintance who lived on the fifth floor.  She drank one or two rum

and coca-cola mixed drinks with him.  After about an hour, she began to feel disoriented, "[l]ike

everything was spinning," and felt "[r]eally heavy and lethargic."  (Michelle Williams Dep.

77:18-21, 79:15-16, Oct. 23, 2009.)  Williams has no memory of how she left the acquaintance's

apartment.  (Id. 78:23-25.)  Williams does recall getting ready for bed in her apartment and going

to sleep there.  (Id. 81:22-24.)  When the Officers woke her up in the hallway in front of the

Karps' apartment door, she thought she was still in her bed.  The first thing she remembered was

"being nudged, like someone hitting my left side of my body and hearing voices."  (Id. 83:15-

16.)  She felt confused and disoriented and did not understand what the people "want[ed] from

her," or that they were police officers.  (Id. 91:11-22.)  She recalls being lifted "up off my bed"

and "brought to my feet."  (Id. 88:2-16.)  Her vision was "in and out" during in incident.  (Id.

89:16-17.)  Once she was brought to her feet, she was "knocked down because [she] was hit"

near her "ear or [her] head."  (Id. 91:4-6, 96:7.)  Williams testified that, "I thought that it was

[the female officer's] fist [that hit me], but I didn't see her fist, I just felt it."  (Id. 97:5-6.)

Williams testified that the "hitting" lasted for about two minutes.  (Id. 97:16.)  When asked

whether she remembers kicking or striking the Officers, Wiliams answered "no," and "no, I do

not remember."  (107:13-108:4.)  Williams did not have any identification with her and she does

not remember telling the officers that she lived in the building.  (102:13-19.)  Williams does not

appear to contend that the Officers used any improper force after they handcuffed her and when

they escorted her out of the building and into the police car.

---

[2] Williams was also taking an antidepressant and a mood stabilizer at the time.  Williams's
prescribed dosage of Seroquel was apparently less than 150 milligrams.  (See Williams Dep.
68:14-69:16.)

There is some dispute as to how Williams was dressed when she was found and arrested. Elissa Karp observed that Williams appeared to be wearing a pants suit, with "her shirt over her head so she was topless, and she was wearing pants…she was wearing the jacket and the shirt that was underneath was over her face." (E. Karp Dep. 7:23-8:16.) Joshua Karp concurs with his wife in that he described Williams as "topless" several times over the course of his deposition. Dorilus remembers that when they arrested her, Williams was wearing a shirt, but it was partially ripped and partially on her body. (Dorilus Dep. 128:11-12.) Rivera basically agrees.

When Williams arrived at the station, she remembers that she could see herself and she was wearing "a black pea coat and pin-striped suit pants." (Williams Dep. 102:23-103:5.) Williams stated that the pea coat "had to be 'checked in' although it was [her] only possession; literally the clothes off my back and it was hung up with a ticket and put with the cell phones and other peoples [sic] possessions." Once at the police station, Williams does not believe that Dorilus and Rivera remained in the processing area with her. (Id. 104:23-105:1.) According to her deposition, she was fingerprinted right after being brought to the station—before she was placed in the cellblock. (Id. 104:3-19.) While she was being fingerprinted, another female officer took her to put a "piece of plastic on me." (Id. 109:9-13.) It was a plastic shirt with sleeves. (Id. 114:10-12.)

At the station, one of the Officers called EMS because Williams complained of pain. (Dorilus Dep. 131:23-132:20.) The Amended Complaint alleges that Williams suffered an injured right eye socket, ear hemorrhaging, and bruising and lacerations about her head, body, and feet. (Am. Compl. ¶ 27.) None of the parties provided any evidence in support or

opposition to the motion for summary judgment that supports or contradicts these asserted injuries.[3]

Rivera signed a complaint against Williams charging her with disorderly conduct, N.J. Stat. Ann. 2C:33-2, assault on police, N.J. Stat. Ann. 2C:12-1(b)(5)(A), and resisting arrest, N.J. Stat. Ann. 2C:29-2(a).  Dorilus signed a complaint against Williams for assault on police.  The charges were dismissed because the Officers did not appear in court.

The Amended Complaint was filed on April 21, 2010 after the parties had engaged in substantial discovery.  Rivera and Dorilus moved to dismiss Count Five of the Amended Complaint for failure to comply with the New Jersey Tort Claims Act.  The City joined in the motions and the Court held oral argument on June 7, 2010.  Before the Court issued a decision on the motion to dismiss, the Officers filed the present motions for summary judgment on June 21, 2010.  The City did not join in the summary judgment motions.  The Court will resolve both sets of motions in this opinion.

Williams asserted five causes of action in the Amended Complaint.  Count One asserts a § 1983 claim for municipal liability on the part of the City, for negligent training and supervision.  Count Two is a § 1983 claim against the Officers and the City for excessive force in violation of the Fourth and Fourteen Amendment.  Count Three asserts a cause of action against the City for invasion of privacy in violation of Williams's Fourth Amendment rights.

_____

[3] On page 15 of Williams's opposition brief, she asserted that Rivera "noticed Williams sustained some bruises to her fact and body," referring to "Exhibit F" as the source of the assertion.  According to the Shelton Certification, Exhibit F was the "original Confidential Memo from Sergeant J. LaSpata to Captain A. Sofianakos, Re:  C.A.P. # 5348" dated May 21, 2009.  The Court was not able to find this document within Williams's submissions to the Court, and therefore, was unable to locate the aforementioned statement.  The Court did locate Exhibit G, which is another Memo from LaSpata, also dated May 21, 2009 and related to Williams's case.  In any case, the Court will assume, for the purpose of this motion, that Williams did sustain the injuries asserted in the Amended Complaint because the Defendants have not denied that Williams was injured during the struggle.

Count Four is a § 1983 claim against the City for failure to provide medical services. Count Five is a common law claim for malicious prosecution against the Officers and the City. Williams seeks compensatory and punitive damages, attorneys' fees, and costs.

## II.  MOTIONS FOR SUMMARY JUDGMENT

Dorilus and Rivera incorporate one another's arguments. They contend that summary judgment is appropriate because the independent witnesses, the Karps, present a version of the events that is not inconsistent with Williams's account. The material facts presented in the Karps' version of the story support a finding that Williams's constitutional right to be free of unreasonable seizures was not violated during the arrest; even if it was, the Officers are entitled to qualified immunity because they were not clearly incompetent. The Officers contend that the claims for invasion of privacy and failure to provide medical attention were not asserted against them in the Amended Complaint. In the alternative, those claims find no support in the undisputed record. With regard to the malicious prosecution claim, the Officers contend that they did have probable cause to charge Williams with assault on police, resisting arrest, and disorderly conduct, so a malicious prosecution claim must fail. Williams's principal argument in opposition to the summary judgment motion is that there are disputed historical facts that require a trial.

A.      **Standard of Review**

Summary judgment is proper where "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). For an issue to be genuine, there must be "a sufficient evidentiary basis on which a reasonable jury

could find for the non-moving party." <u>Kaucher v. County of Bucks</u>, 455 F.3d 418, 423 (3d Cir. 2006).  For a fact to be material, it must have the ability to "affect the outcome of the suit under governing law."  <u>Id.</u>  Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment.

In a motion for summary judgment, the moving party has the burden of showing that no genuine issue of material fact exists.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).  When the moving party does not bear the burden of proof at trial, the moving party may discharge its burden by showing that there is an absence of evidence to support the non-moving party's case. <u>Id.</u> at 325.  If the moving party can make such a showing, then the burden shifts to the non-moving party to present evidence that a genuine issue of fact exists and a trial is necessary. <u>Id.</u> at 324.  In meeting its burden, the non-moving party must offer specific facts that establish a genuine issue of material fact, not just create "some metaphysical doubt as to the material facts." <u>Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986).

In deciding whether an issue of material fact exists, the Court must consider all facts and their reasonable inferences in the light most favorable to the non-moving party.  <u>See</u> <u>Pa. Coal Ass'n v. Babbitt</u>, 63 F.3d 231, 236 (3d Cir. 1995).  The Court's function, however, is not to weigh the evidence and determine the truth of the matter, but, rather, to determine whether there is a genuine issue for trial.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249 (1986).  If there are no issues that require a trial, then judgment as a matter of law is appropriate.

**B.      Count Two:  Excessive Force**

Count Two alleges that the Officers assaulted Williams.  In order to prove her § 1983 claims against the Officers, Williams must show that they were acting under color of state law and that while acting under color of state law, they deprived her of a right secured by the

Constitution.  See Gomez v. Toledo, 446 U.S. 635, 640 (1980); Groman v. Township of Manalapan, 47 F.3d 628, 633 (3d Cir. 1995). There is no question that at all relevant times, Dorilus and Rivera were acting under color of state law.  Because they were police officers in the State of New Jersey, this element of Williams's claim is not in dispute. See Lugar v. Edmondson Oil Co., 457 U.S. 922, 935 n.18 (1982) ("[S]tate employment is generally sufficient to render the defendant a state actor.").  It is also undisputed that the Officers arrested Williams.  The Court must determine whether the Officers used excessive force to make that arrest in violation of Williams's Fourth Amendment rights.

"[A] Fourth Amendment seizure [occurs]…when there is a governmental termination of freedom of movement through means intentionally applied."  Brower v. County of Inyo, 489 U.S. 593, 596-597 (1989) (emphasis omitted).  A claim of "excessive force in the course of making [a] . . . 'seizure' of [the] person . . . [is] properly analyzed under the Fourth Amendment's 'objective reasonableness' standard."  Scott v. Harris, 550 U.S. 372, 381 (2007) (quoting Graham v. Connor, 490 U.S. 386, 388 (1989)).

The reasonableness of an officer's use of force is measured by an examination of the totality of the circumstances, which requires "careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Graham, 490 U.S. at 396. Additionally, the Court of Appeals has noted that other factors may also be relevant, including: "whether the force applied…[led] to injury…the possibility that the persons subject to the police action are themselves violent or dangerous, the duration of the action, whether the action takes place in the context of effecting an arrest, the possibility that the suspect may be armed, and the number of

persons with whom the police officers must contend at one time."  Sharrar v. Felsing, 128 F.3d 810, 822 (1997).

Significantly, the Supreme Court has instructed in applying the objective reasonableness test that the "reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than the 20/20 vision of hindsight."  Graham, 490 U.S. at 396.  "Not every push or shove, even if it may seem unnecessary in the peace of a judge's chambers," is constitutionally unreasonable.  Id. at 396.  The reasonableness inquiry should give appropriate scope to the circumstances of the police action, which are often "tense, uncertain, and rapidly evolving."  Id. at 397.  The inquiry is an objective one.  "An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional."  Id.

There is no question here that the Officers seized Williams when they arrested her. Therefore, the only question before the Court with respect to Count Two is whether the Officers' use of force was reasonable in light of the Fourth Amendment objective reasonableness test.  In this case, the relevant elements may be the severity of the crime at issue; whether Williams posed an immediate threat to the safety of the Officers, the Karps, or others; whether Williams was actively resisting arrest or attempting to evade arrest by flight; that the force applied led to injury; the possibility that Williams was violent or dangerous; the duration of the action; and that the action took place in the context of effecting an arrest.  See Graham, 490 U.S. at 396; Sharrar, 128 F.3d at 822.

Before the Court can apply the objective reasonableness test, it must address the factual contentions that Williams raises.  Williams took painstaking care to chronicle every manner in

which the various witnesses' stories differed.  However, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Liberty Lobby, 477 U.S. at 247-248.  Factual disputes are only genuine if they "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."  See id. at 250. When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.  Scott, 550 U.S. at 380. Additionally, a fact is only material if it "might affect the outcome of the suit under the governing law." Liberty Lobby, 477 U.S. at 248.

Williams contends that she did not have the capacity to assault the Officers.  That argument is clearly contradicted by the record.  Williams bases her argument on testimony that she was weak, intoxicated, and confused at the time of the incident.  However, even if she was weak, confused, and intoxicated, no reasonable jury could conclude that she was too weak to run around and flail her arms and legs after hearing the testimony of Elissa and Joshua Karp, two independent witnesses, coupled with the corroborating testimony of both Officers that she did so. Likewise, Williams' testimony that she does not recall flailing her arms and legs cannot defeat summary judgment.  The self-serving testimony of a woman who was admittedly confused, disoriented and intoxicated will not defeat the reliable and unbiased testimony of the two independent witnesses.  The Court is not bound to accept a version of the facts that is blatantly contradicted by the record.  See Scott, 550 U.S. at 380.  Furthermore, the Karps' and the Officers' testimony about the manner in which she was swinging her arms and legs is actually consistent with Williams's account of the events.  Joshua Karp asserted that Williams was

flailing in an uncoordinated manner like a baby's temper tantrum; that testimony is entirely consistent with Williams's assertion that she was confused and intoxicated.  The Court finds that there is no genuine dispute as to whether Williams was running around and flailing her arms and legs at the Officers after they woke her up.

Williams asserts that the incident was not as loud as the Officers claimed it was in their police report.  (Plf.'s Opp'n Br. 27.)  That fact is clearly not material to the Court's decision of whether the Officers applied excess force in arresting Williams.  Williams also harps on the factual issue of whether the Officers considered if Williams had been the victim of a crime.  That factual question is immaterial because it is not relevant to the question of whether the force the Officers used when they arrested her was excessive.[4]

During oral argument, Williams asserted that the Karps' testimony was not credible because there were some differences between the Karps' testimony and the Officers'.  For instance, the Officers both assert that they succeeded in handcuffing Williams while they were still on the fifth floor.  The Karps both do not remember seeing them handcuff her there.  That dispute is not genuine because the stories of the Karps and the Officers do not actually conflict; rather, the Karps simply do not remember something that the Officers assert they did.  There are countless factual issues about which Williams makes similar assertions; if one witness testified to seeing something occur and the other witness does not remember, she contends that the second

_____

[4] Plaintiff confuses the Fourth Amendment jurisprudence regarding the lawfulness of an arrest with the jurisprudence regarding the objective reasonableness of using force to make an arrest. Williams did not assert in the Amended Complaint that she was unlawfully arrested; she only asserted that when she was arrested, the Officers used excessive force.  Therefore, Williams's arguments about the alleged unlawfulness of her arrest are not relevant to this Court's determination about the Officers' use of force.  Williams's arguments about probable cause— that she asserted in the context of her argument that the arrest was unlawful—may be relevant to her claim of malicious prosecution, so the Court will address those arguments in that portion of the opinion.

witness has discredited the former's account.[5]  These small discrepancies do not create genuine issues, and Williams cannot meet her burden to present evidence that a genuine issue of fact exists and a trial is necessary by poking small inconsequential holes in each witness's story.

Having responded to Williams's factual contentions, the Court will turn to its analysis of whether the force Dorilus and Rivera used to arrest Williams was reasonable.  After ascertaining that Williams's vital signs were intact, the Officers attempted to wake her up by using verbal commands and nudging her.  The witnesses and the Officers at the scene were surprised when she woke up and became instantly violent.  The Karps went to the stairwell to stand clear of the scene and the Officers attempted to control Williams, who was kicking, flailing her arms, and running back and forth.  Dorilus pinned her against the wall, holding her arms down to prevent her from hitting him.  Williams's flailing limbs kicked Dorilus in the groin and punched Rivera.  Although the crime for which the Officers would initially arrest Williams—disorderly conduct—is not a serious one, as the scene unfolded, reasonable officers would assume that they were under attack and Williams was attempting to evade them.  When the Officers advised her that she was under arrest, she continued to fight and kick.  All four of the people present—the Karps and the Officers—felt threatened by Williams's erratic, unexpected, and combative behavior.

The Officers used compliance holds and pressure points, "took her back down" when she tried to stand up, and struck Williams with their hands to bring her under control.  Finally, the Officers were able to hold Williams down long enough to put the handcuffs on her.  They did not

---

[5] For example, Williams asserts that the testimony of the witnesses as to where Williams's flailing limbs hit Dorilus is contested.  Joshua Karp testified that he saw Williams's limbs hit Dorilus "in multiple places," including his "head and upper body."  Dorilus, according to Williams, only asserts that he was struck in the groin, since he "never said that Williams struck him in multiple places."  This argument is another attempt to poke small holes in the factual landscape by asserting that facts are inconsistent when they are not.  Dorilus never asserted that Williams did not strike him in multiple places.  Moreover, this dispute is not material.  The important factual assertion to be drawn from the aforementioned testimony of Karp and Dorilus is that Williams was flailing in a way that caused physical harm to the Officers.

use any weapons or other agents.  The duration of the struggle was about two minutes according to Williams's own testimony. The Court finds that the undisputed material facts support a showing that the Officers' use of force was appropriate under those circumstances.  Fourth Amendment jurisprudence has "long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it."  Graham, 490 U.S. at 396.  It was not unreasonable for the Officers to use their hands and compliance holds to force the compliance of a woman who was posing such an unexpected danger to two police officers and two witnesses.  The injuries Williams alleges in the Amended Complaint—an injured right eye socket, ear hemorrhaging, and bruising and lacerations about her head, body, and feet—do sound severe, but they do not appear to be inconsistent with the amount of force the Officers claim to have used and that the witnesses saw them use.  It is not surprising that Williams sustained injuries in the process of the scuffle. Having determined that the Officers did not use excessive force to arrest Williams, the Court need not determine whether they are entitled to qualified immunity from suit on this claim.  The Court will grant summary judgment to Rivera and Dorilus on Count Two.

## C.     Count Three:  Invasion of Privacy

Count Three alleges that when the Officers arrested and detained Williams, she was in a semi-nude state. (Am. Compl. ¶ 41.)  The Amended Complaint alleges that this violated her constitutional rights because she "had a reasonable expectation not to be observed unclothed or to have her private parts observed by others."  (Id. ¶ 41.)  Rivera maintains that the Officers are not named in Count Three because the prayer for relief in that claim only demands compensatory damages from the City of Elizabeth.  Williams does not directly address this argument in her opposition brief.  Rivera's argument is not without merit; whereas in the prayer for relief

pertaining to Counts Two and Five Rivera and Dorilus are specifically named, their names do not appear at all in the prayers for relief pertaining to Counts One, Three, and Four.  That gives rise to a fair assumption that the Amended Complaint only stated claims under Counts Two and Five against the Officers.

However, the Amended Complaint does allege that Williams "was arrested and detained in a semi-nude state, exposed to unnecessary observation by members of the opposite sex and required to remain topless longer than necessary."  Since Dorilus and Rivera were the arresting officers, a rather liberal reading of the Amended Complaint could find that a claim was asserted against them for this count.  In the interest of construing the Amended Complaint liberally, the Court will accept that Count Three states a claim against the Officers and for the purpose of evaluating Dorilus's arguments in support of dismissal of that claim—which Rivera incorporated in her motion for summary judgment—with respect to the invasion of privacy claim.

Dorilus argues that the facts show that the Officers were not responsible for Williams's nudity at the police station.  In support of this argument, Dorilus asserts that according to Williams's own testimony, when the Officers took Williams to the police station, she was wearing a pea coat that covered her upper body.  According to Williams's answer to interrogatories, when she "checked in," someone made her check the pea coat as a personal item.  Once at the police station, Williams does not believe that Dorilus and Rivera remained in the processing area with her.  (Williams Dep. 104:23-105:1.)  According to her deposition, she was fingerprinted right after being brought to the station—before she was taken to the cellblock.  (Id. 104:3-19.)  While she was being fingerprinted, another female officer gave her the plastic shirt with sleeves.  Dorilus argues, and the Court agrees, that these facts—all of which are derived from Williams's own testimony—show that the Officers were not responsible for Williams's

state of undress while at the police station; when they brought her in she was wearing a coat, someone else took it from her, and then during fingerprinting—before Williams was taken to the cellblock—a female officer gave her a shirt.  According to this set of facts, Dorilus and Rivera appear to have been uninvolved after they dropped Williams off in her pea coat.  Thus, as the moving parties, they have met their burden of showing that there is no evidence that they were responsible for Williams's state of undress at the police station.  Accordingly, the burden shifts to Williams to present evidence that a trial is necessary to determine whether the Officers were involved in failing to provide Williams with clothing to cover her upper body.

Plaintiff argues that LaSpata's memorandum, which states that

> Statements made by Officer Dorilus, Officer Cross and EMT Caldwell indicate that Ms. Williams's breasts were exposed while she was in the Elizabeth Police Department cellblock….The evidence did show that Ms. Williams was eventually provided with coverage.  However, Officers Dorilus and Rivera should have provided Ms. Williams with coverage before they escorted her into the cellblock.

This evidence does not suffice to meet Williams's burden of showing that a trial is necessary for two reasons.  First, this memorandum contains the secondary conclusions of an investigating officer, rather than primary testimony, so the writer has no personal knowledge of the events described.  It is likely that this evidence would be inadmissible at trial, so it cannot support a motion for summary judgment.  Second, LaSpata's memorandum actually contradicts Williams's own testimony in an important manner.  LaSpata asserts that Dorilus and Rivera should have provided Williams with coverage before she was taken to the cellblock.  Williams, on the other hand, stated that she was taken for fingerprinting and given the plastic shirt before she went to the cellblock.  The Court finds that the undisputed facts show that Dorilus and Rivera

were not responsible for Williams's state of undress while in the cellblock or processing area. The Court will grant summary judgment to Dorilus and Rivera on Count Three.

**D.        Count Four:  Failure to Provide Medical Attention**

Rivera and Dorilus assert that the Count Four is not alleged against them in the Amended Complaint.  The Court agrees.  The Court can find no allegation to the contrary in the Amended Complaint.  However, again, Williams assumed in her opposition papers without explanation that the Officers were moving for summary judgment on Count Four and in their reply papers, the Officers addressed those arguments.  Williams argues that the Officers failed to provide her with medical attention.  Assuming that the Amended Complaint does state a claim for failure to provide medical attention against the individual officers, the Court finds that the undisputed evidence clearly refutes such a claim.  It is uncontested that when Williams complained of pain at the police station, either Dorilus or Rivera called for Emergency Medical Services ("EMS"). Rivera saw the medical personnel interacting with Williams but she was not involved in the conversation.  Later, she wrote in her police report that "EMS-6 was notified and responded to the cellblock where Ms. Williams refused medical attention."  During her deposition, Rivera stated that EMS has informed her that Williams refused medical attention.  There are no facts in the record suggesting that the Officers failed to provide Williams with medical attention; they called an EMS and observed that Williams interacted with EMS.  There is no support in the record for an assertion that the Officers should have done more than they did.  The Court will grant summary judgment to Dorilus and Rivera on Count Four.

**E.        Count Five:  Malicious Prosecution**

Count Five alleges that the Officers' criminal complaints against Williams constituted malicious prosecution.  The Officers argue that they are entitled to summary judgment on this

claim.  Williams responds that summary judgment is not appropriate, but only supports that argument by asserting the same factual disputes she asserted in her arguments regarding the excessive force claim.  The Court finds that the material facts are not in dispute and summary judgment on Count Five is appropriate.

In New Jersey, the common law tort of malicious prosecution has four elements:  (1) the criminal action was instituted by the defendant against the plaintiff; (2) it was actuated by malice; (3) there was an absence of probable cause for the proceeding; and (4) the proceeding was terminated favorably to the plaintiff.  Lind v. Schmind, 67 N.J. 255, 262 (1975).  Here, the first and fourth elements are not contested.  The proceeding was terminated because the Officers failed to appear at the hearing dates.  The Officers focus on the probable cause element in their arguments, which the New Jersey courts have stated, is "the essence of the cause of action."  Id. The burden is on the plaintiff to prove that probable cause did not exist.  Id. at 263.

In New Jersey, a person is guilty of disorderly conduct if she "[e]ngages in fighting or threatening, or in violent or tumultuous behavior."  N.J. Stat. Ann. 2C:33-2(a).  Aggravated assault consists of a simple assault on a police officer while he is in uniform or exhibiting his authority.  N.J. Stat. Ann. 2C:12-1(b)(5)(A).  A person is guilty of simple assault if he attempts to cause or purposely, knowingly or recklessly causes bodily injury to another; negligently causes bodily injury to another with a deadly weapon; or attempts by physical menace to put another in fear of imminent serious bodily injury.  Finally, a person is resisting arrest if he attempts to prevent a law enforcement officer from effecting an arrest.  N.J. Stat. Ann. 2C:29-2(a).

The question before the Court is whether Dorilus and Rivera had probable cause to make those charges.  Probable cause exists if there is a "fair probability" that the person committed the

crime at issue.  Wilson v. Russo, 212 F.3d 781, 789 (3d Cir. 2000) (citing Sherwood v. Mulvihill, 113 F.3d 396, 401 (3d Cir. 1997).   "Probable cause to arrest exists when the facts and circumstances within the arresting officer's knowledge are sufficient in themselves to warrant a reasonable person to believe that an offense has been or is being committed by the person to be arrested."  Id. (quoting Orsatti v. New Jersey State Police, 71 F.3d 480, 483 (3d Cir. 1995)).

As the Court previous determined, there is no genuine dispute that when Williams woke up, she flailed her legs and arms at the Officers, ran around the hallway, banged on the Karps' door, and was described by an independent witness as "attacking" the Officers.  The Officers struggled to subdue Williams and only after two minutes were they able to handcuff her.  They were wearing uniforms and announced that they were police officers.  They warned Williams that she would be arrested for disorderly conduct if she did not calm down.  Those facts make clear that the Officers had probable cause to charge Williams with resisting arrest, disorderly conduct, and assault on two police officers.  Rivera and Dorilus's motions for summary judgment will be granted and the claim for malicious prosecution against them dismissed.

### III.  MOTION TO DISMISS COUNT FIVE

The Court will now turn to the previously filed motions to dismiss Count Five of the Amended Complaint for failure to properly serve a notice of claim as required by the New Jersey Tort Claims Act ("TCA").  These motions were filed by Dorilus and Rivera and joined by the City.  The Court held oral argument on June 7, 2010.

The Defendants argue that a letter sent by Williams's attorney did not comply with the notice provisions of the TCA because it failed to provide (1) information about the occurrence, such as the date, place, and other key details; (2) a description of Williams's injury; (3) the names of the employees involved in the incident; and (4) the amount of damages claimed.  The

Defendants claim that these deficiencies require dismissal of Williams's claim.  In the alternative, the Defendants assert that Williams also failed to complete a supplemental claim form that is additionally required by the City to be filed.  Williams counters that she did substantially comply with the notice requirements; and that in the alternative, the Defendants should be equitably estopped from asserting this defense because the City never informed Williams that the notice was defective.

The TCA "regulates both the substantive liability on public entities as well as the procedural requirements which must be observed when bringing a claim against a public body." Martin v. Twp. of Rochelle Park, 144 N.J Super. 216, 219 (App. Div. 1976) (superseded by statute on other grounds).  Malicious prosecution is a claim that is subject to the notice requirements of the TCA.  See Velez v. City of Jersey City, 180 N.J. 284 (1984) (holding that the filing requirements under the TCA apply to claims for common law intentional torts against public employees).

The TCA states that "[n]o action shall be brought against a public entity under this act unless a claim upon which it is based shall have been presented in accordance with the procedure set forth in this chapter."  N.J. Stat. Ann. § 59:8-3.  Prior to filing a complaint against public entities and their employees for injury or damage to person or property, a plaintiff must submit a "notice of claim" to the public entity within ninety days of the claim's accrual.  N.J. Stat. Ann. § 59:8-8.  "The purpose of the ninety-day limit in the TCA is to 'compel a claimant to expose his or her intention and information early in the process in order to permit the public entity to undertake an investigation while witnesses are available and the facts are fresh.'" Ventola v. N.J. Veteran's Mem'l Home, 751 A.2d 559 (2000) (citing O'Neill v. City of Newark, 701 A.2d 717 (N.J. Super. App. Div. 1997)).

22

The notice of claim must contain:

   a.   The name and post office address of the claimant;

   b.   The post-office address to which the person presenting the claim desires notices to be sent;

   c.   The date, place and other circumstances of the occurrence or transaction which gave rise to the claim asserted;

   d.   A general description of the injury, damage or loss incurred so far as it may be known at the time of presentation of the claim;

   e.   The name or names or the public entity, employee or employees causing the injury, damage or loss, if known; and

   f.   The amount claimed as of the date of presentation of the claim, including the estimated amount of any prospective injury damage, or loss, insofar as it may be known at the time of the presentation of the claim, together with the basis of computation of the amount claimed.

N.J. Stat. Ann. § 59:8-4.

A failure to provide such notice within the statutory time frame subjects claims to dismissal with prejudice.  N.J. Stat. Ann. § 59:8-7; see also Sinclair v. Dunagan, 905 F. Supp. 208, 212-213, 215 (D.N.J. 1995).

Ms. Williams produced in discovery what she contends is a valid "notice of claim" as required under the TCA.  This one-page letter is dated August 13, 2008, is addressed to Elizabeth City, One Police Plaza, Elizabeth, NJ, and was written and signed by Ms. William's attorney. The letter states, in relevant part:

> Dear City Administrator:
>
> Please be advised of Michelle Williams intent pursuant to N.J.S.A. § 59:8-4 to file suit and maintain a civil rights action as a result of injuries sustained on or about 11/18/07 in an unprovoked police action.
> Ms. Williams was prosecuted maliciously in an attempt to cover police misconduct. On or about June 04, 08 the matter was terminated favorably for Ms. Williams as officers failed to appear for trial after proper notice by the prosecutor's office.
> Please provide this office with the name of the person assigned to this matter and your internal claim number.

Defendants argue that the letter of August 13, 2008, did not give the information required by N.J. Stat. Ann. § 59:8-4(c)-(f) and therefore Count V should be dismissed with prejudice. Williams argues that her letter substantially complied with the notice requirements of N.J. Stat. Ann. § 59:8-4.  In the alternative, the Defendants should be equitably estopped from claiming that her notice was deficient because they did not inform her of the deficiencies when she sent the letter.  The Court will address each issue in turn.

The New Jersey courts require at least "substantial compliance" with the provisions of N.J. Stat. Ann. § 59:8-4 in order for a notice of claim to have effect.  See Newberry v. Twp. Of Pemberton, 319 N.J. Super. 671, 679 (App. Div. 1999).  Substantial compliance means that the notice has been given in a way, which though technically defective, substantially satisfies the purposes for which notices of claims are required.  Lebron v. Sanchez, 407 N.J. Super. 204, 216 (App. Div. 2009) (citations and quotations omitted).  The doctrine requires the party asserting it to show:  (1) the lack of prejudice to the defending party; (2) a series of steps taken to comply with the statute involved; (3) a general compliance with the purpose of the statute; (4) a reasonable notice of petitioner's claim; and (5) a reasonable explanation why there was not strict compliance with the statute.  Id.

In Newberry, the Appellate Division determined that a notice was not in substantial compliance with the TCA when the notice stated—as the basis for the township's liability—that the claimant had been hit by a vehicle running a stop sign. The claimant's theory was that the township was responsible for trimming foliage that was covering the stop sign and the notice simply did not inform the township of this reason for its alleged liability.  That notice, the Appellate Division found, was not sufficient to give the township sufficient information for it to understand that the failure to trim the foliage was the basis alleged to give rise to its liability.

24

The nexus between the event—an automobile accident—and the township's liability was not clear from the notice.  Id. at 680.  In Lebron, 407 N.J. Super. at 218, in contrast, the Appellate Division found that the plaintiff had substantially complied with the statute's requirement that she state the basis for her claim when her notice stated that she was a minor who was injured when she left school.

Williams contends that her letter substantially complied with the notice requirements because provided the City with information about (1) the claimant's name; (2) contact information; (3) the date of the incident, November 18, 2007; (4) the circumstances of the incident—"intent to file suit and maintain a civil rights action as a result of injuries sustained in an unprovoked police action;" (5) notice of her injury—"Williams was prosecuted maliciously;" and (6) the date the matter was terminated favorably for Williams.

The Court is not convinced that such notice constituted substantial compliance.  The notice does not give the City any information about the underlying incident—including the name of the public employees who are alleged to have maliciously prosecuted Williams or the location where the underlying incident occurred; the circumstances under which the case was terminated in Williams's favor; or the amount of damages claimed.  Importantly, without information about the underlying incident, the City was not on notice of the basis for its liability and may have been unable to begin the relevant investigation to determine whether there was probable cause for the charges the public employees made against Williams.  Additionally, Williams has not asserted, as required by Lebron, that she took a series of steps to comply with the statute; she only sent one letter.  She does not explained why she did not strictly comply with the statute's requirements; she only asserts that the City should have informed her of the deficiencies.  The

Court cannot find that Williams's August 13, 2008 letter met the standard of substantial compliance with the TCA's notice provisions.

The Court will turn to Williams's alternative argument, that the City should be equitably estopped from asserting that the letter is insufficient because the City did not inform her of the deficiencies when it received the letter.  The doctrine of equitable estoppel has been held to bar notice of claim defenses under the TCA.  Murray v. Brown, 259 N.J. Super 360, 363 (Law Div. 1991) (collecting cases).  Murray provides substantial support for Williams's argument. Although it was a trial-level decision, its central holding—that "[w]hen a governmental entity receives a claim, however defective, it is unreasonable for it to essentially disregard the claim because of deficiencies"—has been cited favorably by the Appellate Division and the New Jersey Supreme Court.  See Lebron, 407 N.J. Super. at 219 (citing Murray, 259 N.J. Super. at 365) ("If deficiencies in the notice were uncovered, justice and fairness require plaintiff to be advised, not ignored."); Feinberg v. N.J. Dep't of Envtl. Prot., 137 N.J. 126, 135 (1994) (citing Murray, 259 N.J. Super. at 365) ("Nothing in the Act evinces the legislative intent that governmental entities, whether intentionally or unintentionally, should be able to impale a diligent claimant on the Act's technical requirements for notification.") (quoting Murray, "[a] governmental entity should [not] feel free to ignore the claimant in the hope that within a short time it might be able to use a technical cavil to avoid fair litigation.").  New Jersey courts have stated that when a court must determine whether to allow a late claim, doubts should be resolved in favor of hearing the claim on its merits.  See Feinberg, 137 N.J. at 135.

In Murray, the plaintiff was injured in an accident with a sanitation truck driven by a public employee.  A few weeks later, the city received notice that complied fully with N.J. Stat. Ann. 59:8-4.  The plaintiff's attorney also filed the city's supplemental form but it was missing

information.  Instead of communicating with the attorney, however, the city sent a letter directly to the plaintiff informing him of the deficiencies.

The Murray court stated that estoppel may arise "because the conduct of the governmental entity justified the injured party's belief that the former was not dissatisfied with the claim information as submitted." Id. at 363.  Specifically, Murray explained that in New Jersey jurisprudence, even silence or an omission may serve as a basis for estoppel. Id. at 364 (quoting State v. United States Steel Corp., 22 N.J. 341, 358 (1956)).  The court held that "[t]he interests of justice and fairness require that the claimant be promptly advised of the deficiencies and that failure to cure will result in rejection of the claim by the entity and a possible loss of the right to maintain a civil action." Id. at 365.  In Murray, the court concluded that the city's failure to communicate with the plaintiff's attorney about deficiencies in the supplemental fillings served as grounds for estopppel.

In Navarro v. Rodriguez, 202 N.J. Super. 520 (Law Div. 1984), another trial-level court faced a similar question but arrived at a different conclusion based on the facts before it.  There, the plaintiff also asserted that the city was equitably estopped from raising his failure to adequately answer all questions on its form, because the city never sent a letter to plaintiff informing him that his answers were deficient.  The court recognized that estoppel principles may apply to TCA arguments where "where the interests of justice, morality and common fairness dictate that course." Id. at 531.  In Navarro, the city had responded to the plaintiff's preliminary submission—which was deficient—with only a request that the attorney's client sign an authorization for the hospital to receive his medical records.  The plaintiff's attorney never responded and the city was not supplied with any information from the plaintiff about his medical condition or treatment.  The Court concluded that "[t]he City did all that could be

reasonably expected of it, and, therefore, the interests of justice and common fairness clearly indicate that there is no basis for applying estoppel principles against the City." Id.

In Dambro v. Union County Park Comm., 130 N.J. Super. 450, 457-58 (Law Div. 1974), a borough tax assessor informed the plaintiff that the area where he was injured was owned by a park commission, when it was actually owned by the borough. The law division held that the municipality was estopped from shielding itself from liability under a TCA notice defense based on a mistake of its employee tax assessor.

In Anske v. Borough of Palisades Park, 139 N.J. Super. 342 (App. Div. 1976), the plaintiff personally reported his injury to the borough clerk, who told him that an insurance agent would take care of it. Shortly thereafter, an insurance agent communicated with the plaintiff and visited him when he was discharged from the hospital. Nothing else happened after that, so the plaintiff retained an attorney and filed suit. The defendant borough filed an answer with general denials. One year after the claim had accrued, the borough amended its answer to include the defense of failure to file a notice of claim. The Appellate Division held that the borough was estopped from asserting that defense based on the particular facts of the case, including that the plaintiff had informed the borough clerk and been visited by an insurance agent, and the borough had waited a year to assert the defense.

In Johnson v. Does, 950 F. Supp. 632, 636-37 (D.N.J. 1997), this court examined the relevant precedent and determined that a plaintiff would not be able to assert equitable estoppel where the county had sent four reminders to complete its supplemental form and the plaintiff's attorney failed to do so.

The Court will allow Williams to benefit from the doctrine of equitable estoppel. As stated in Murray, the "governmental entity should [not] feel free to ignore the claimant in the

hope that within a short time it might be able to use a technical cavil to avoid fair litigation."
259 N.J. Super at 365.  It does not appear to be uncommon that when a person sends a notice of
claim, the government entity will often respond in some way, either by sending a supplemental
form or asking for more information.  The City's failure to respond to the letter here led
Williams to erroneously believe that her notice was sufficient.  Importantly, the City has not
asserted that it was prejudiced in its ability to investigate the claim based on Williams's failure to
provide more information.  The Court is not finding that the City had an affirmative duty to
inform Williams of the failure to provide adequate information; rather, the Court is merely
holding based on the facts before it, the City led Williams to believe that her notice was
sufficient by not responding to it, and the City has not asserted that it would be prejudiced by
Williams's failure to provide the information, so equitable estoppel is appropriate here.

     The Court will deny the City's motion to dismiss Count Five.  Having already dismissed
Count Five on the merits as against Dorilus and Rivera, this decision only impacts the City's
litigation with Williams.  The motions of Dorilus and Rivera will be denied as moot.

## IV.  CONCLUSION

     For the foregoing reasons, Rivera and Dorilus's motions for summary judgment will be
granted in their entirety; all the claims against them are dismissed on the merits.  Having granted
summary judgment on the merits to Dorilus and Rivera, the Court need not rule on their motions
to dismiss premised on jurisdictional grounds.  The City's motion to dismiss will be denied on
Count Five.  The only claims that remain in this case are Counts One, Three, Four, and Five
against the City of Elizabeth, [6] which did not join in this motion for summary judgment.

---

[6] Count Two does not appear to assert a claim against the City.

The Court will enter an order implementing this opinion.


                                        **s/ Dickinson R. Debevoise**
                                        DICKINSON R. DEBEVOISE, U.S.S.D.J.


Dated: September 9, 2010