1

```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF NEW JERSEY
 2                CIVIL ACTION  08-5113-DRD

 3
        MICHELLE WILLLIAMS,        : TRANSCRIPT OF PROCEEDINGS
 4                                 :
                                   :        M O T I O N
 5                  Plaintiffs,    :
                                   :        Pages 1 - 22
 6              -vs-               :
                                   :
 7      CITY OF ELIZABETH, et al,  :
                                   :
 8              Defendants.        :
        - - - - - - - - - - - - - - - -
 9
                                        Newark, New Jersey
10                                      August 16, 2010

11      B E F O R E:   HONORABLE DICKINSON R. DEBEVOISE,
                       SENIOR UNITED STATES DISTRICT JUDGE
12

13      A P P E A R A N C E S:

14          FINCOURT B. SHELTON, ESQ.
            Attorney for the Plaintiff
15
            RAYMOND S. LONDA, ESQ.
16          Attorney for Defendant Durilis

17          DANIEL ANTONELLI, ESQ.
            Attorney for Defendant Rivera
18

19      _____
        Pursuant to Section 753 Title 28 United States Code, the
20      following transcript is certified to be an accurate record as
        taken stenographically in the above entitled proceedings.
21

22                          S/Mollie Ann Giordano
                            MOLLIE ANN GIORDANO
23                          Certified Court Reporter
                            (973-220-9465)
24

25
```

1          MR. LONDA:  Raymond Londa.

2          THE COURT:  It is your motion.

3          MR. LONDA:  Yes.  The brief has fully presented

4    arguments, but there are a few things I would like to point out

5    to the Court.

6          It was set forth in my reply, that I actually made an

7    error in my initial brief.  In the amended complaint by the

8    plaintiff there were really only two allegations against the

9    individual police officers.  They were the use of excessive

10   force in Count Two, and Count Five, common law malicious

11   prosecution.  I addressed in my initial brief also Count Three,

12   which was the invasion of privacy.  There were allegations that

13   Miss Williams was left in a state of undress in the cell in

14   which she was held, and that actually the complaint is only

15   alleged against the City.  So, in essence, we really come

16   before you on summary judgment on just the two counts:

17   Excessive use of force and common law malicious prosecution.

18         THE COURT:  Why not on the other one?

19         MR. LONDA:  Because in the wherever, or the wherever

20   demand for damages, it strictly names the City of Elizabeth,

21   which is the third defendant in this matter.

22         THE COURT:  Do they appear on this motion?

23         MR. LONDA:  No, they're not.

24         THE COURT:  As far as the City of Elizabeth is

25   concerned, there's no application for relief?

Motion                      3

1        MR. LONDA:  They have not -- the City didn't join in

2   the motion, did they?

3        MR. ANTONELLI:  Correct.

4        MR. LONDA:  No one.  The City did not join in this

5   motion.

6        THE COURT:  All right.  A factual question maybe

7   created by the evidence from the plaintiff that she was hit

8   excessively by the police officers.

9        MR. LONDA:  And I would like to address that, your

10  Honor.

11       THE COURT:  I'm wondering if that creates a factual

12  issue.

13       MR. LONDA:  I would say, in most of the cases that we

14  handle on behalf of police officers where there is an

15  allegation of excessive use of force, that is certainly a

16  concern that we have.  But this is one of the fortuitous cases,

17  that we have two independent eye witnesses who have no

18  connection with the City, whatsoever, and have corroborated the

19  version of what happened in the two minutes that it took for

20  the police to get control over the plaintiff.  They confirmed

21  what the police said, that first of all, what we know is that

22  Miss Williams had an excessive amount of alcohol.  She had been

23  prescribed 25 milligrams of Seroquel, but had taken 300.  She

24  was found lying in the hallway of the apartment in a state of

25  either deep sleep or unconsciousness.  The Karps, who tried to

1    get into their apartment because she was before them, were the

2    ones who called the police and they observed what happened.

3    They corroborate completely what the police did.  They

4    attempted to verbally arouse her, shake her hand, shake her

5    foot to arouse her, and when she finally did wake up.  She woke

6    up flailing, and kicking, and stumbling, and ranting and

7    raging.  And in accordance with the testimony that was at the

8    deposition of Joshua Karp, was that the police did nothing but

9    to attempt to restrain this woman who was completely out of

10   control.  That's exactly what the police say, your Honor.

11         And also the plaintiff makes certain admissions, one

12   of which was that she claims that she was being hit.  The Karps

13   say that the police were doing nothing but attempting to

14   control her as she was striking them, and certainly police

15   officers under these circumstances, a reasonable police officer

16   under these circumstances knows that he is entitled to use

17   force to overcome the force of the plaintiff in this matter,

18   your Honor, and the use of force is what qualified immunity is

19   all about.  We are not talking about a long-term assault on

20   this woman, we are talking about what she claims to be a two

21   minutes in which she claims she was hit without provocation;

22   where we have two independent eye witnesses who said that the

23   police did nothing but attempt to control her.

24         I would submit to your Honor that if ever there was a

25   case for qualified immunity, these are the facts, because if

1    police cannot respond in this manner to someone who is

2    obviously impaired by alcohol, impaired by drugs, then when

3    could they ever respond?

4          The Karps have indicated that once they got her under

5    control, that was when it stopped.  She continued to resist,

6    and they even, if your Honor remembers, they even went to their

7    apartment windows to watch as the officers took her downstairs

8    to put her in the police car, that she was continuing to kick,

9    continuing to drag, and they just lifted her up and put her in

10   the car.  There's no allegation that they continued to beat

11   her.

12         This is not a police brutality case, your Honor, as

13   much as they would like to say that.  It simply is not.  But

14   for these two independent witnesses, we'd have a question of

15   fact.  When you have two witnesses who have nothing to gain and

16   no interest in this case, who corroborate the police, I submit

17   to you that an attempt to create a question of fact under these

18   circumstances simply must fail.

19         All right.

20         THE COURT:  I wanted to know that you have more that

21   you had --

22         MR. LONDA:  I would like to address the other issue

23   against the police is malicious prosecution.  Once again, what

24   you do have, you have police who filed the complaints that

25   there was an assault on the police officer, which the witnesses

1    say there was.  She was kicking at them, she was flailing in a

2    Windmill fashion, striking the police officer.  That's assault

3    on a police officer and disorderly person.  And certainly

4    having this behavior in an apartment building is a disorderly

5    person.  The fact that it was not tried because the police

6    officers were not noticed and therefore didn't appear, the case

7    was dismissed.  But that does not prove lack of probable cause,

8    and probable cause is the ultimate defense to this.  And, once

9    again, we have independent witnesses who proved there was

10    probable cause to arrest and to make the charges.

11          So, your Honor, I submit to you that this is the

12    perfect case for qualified immunity.  Our officers --

13          THE COURT:  Do you even get -- if your theory is

14    correct, you don't get to qualified immunity.  Just the facts,

15    themselves, according to you, would not be the basis for the

16    complaint.  The qualified immunity and the facts and the merits

17    of the case overlap.

18          MR. LONDA:  I'm sorry?

19          THE COURT:  I'm just saying -- what if what you say is

20    correct, there is no basis for qualified immunity because you

21    don't get to that question because you've already dismissed the

22    case?

23          MR. LONDA:  Well, for the malicious prosecution, that

24    requires probable cause, and they certainly have probable cause

25    to file the complaints.  The issue of qualified immunity comes

1    to how much on force was used, because clearly there was a need

2    for force.  But, again, as the courts have claimed, the issue

3    of how much force could be used is not something that you can

4    look back in 20/20 hindsight.  It's not something that you

5    determine:  Well, it sounds that it might have been excessive

6    in the quiet camp a courtroom.  These are police officers

7    making their decisions in the split second tumult of this woman

8    acting, as one of the officers described her, as a maniac.  And

9    the trusting aspect of this, your Honor, even more so to prove

10   that the police officers were correct in their assessment and

11   behavior, is that this is a woman who acknowledged that she

12   suffers from manic depression, that she suffers from

13   nightmares, that she periodically had nightmares of people

14   coming into her home and demanding or frightening her, and that

15   she would wake up in her own home and on her own couch; that

16   she was kicking and thrashing.

17        Now, what do you have?  A person in a middle of her

18   nightmare.  She was in a hallway, she doesn't know how she got

19   there.  She's in a hallway, and here are people -- she thinks

20   she's in bed, and they are coming toward her, and they are

21   telling her she has to move, and there is a nightmare, and she

22   starts kicking, and flailing, and punching.  Punch is not

23   correct.  And I do want to be very factual with your Honor.

24   She was flailing her arms and striking the officers.  I think

25   that's where the qualified immunity is, how much force is

1    required to overcome force.  You have a stale mate.  The courts

2    don't require excessive force because then you have, you just

3    have the stale mate.  The police officers are entitled to use

4    whatever level of force is reasonable for a police officer in

5    the tumult of that moment to decide if it's necessary.  And,

6    the whole thing took two minutes, according to the plaintiff.

7            THE COURT:  All right.  Anything else?

8            MR. LONDA:  No, sir.  But if your Honor does want to

9    address the issue of the privacy, I would like to point out one

10   thing.  The plaintiff made a very big argument saying that the

11   internal affairs investigation, saying that the police officer

12   should have been sure that she was covered when they brought

13   her in the cell block.  That was the end of the responsibility

14   for her.  They brought her into the cell block.  But the one

15   piece of information that the internal affairs did not have at

16   the time is an admission that the plaintiff had made in this

17   case, that when she arrived at the police station she saw

18   herself and she was wearing a jacket.  Now, both of the police

19   officers have said that she was wearing clothing that had come

20   askew.  It was a little torn from the scuffle.  She was

21   dressed, and she was not exposed when they brought her there,

22   and therefore they turned her over to be dealt with when they

23   went to write their reports.  It was not their responsibility

24   at that point to deal with her state of dress.

25            And incidentally, one of the issues, of course, that

1    the Sergeant Ospotta who wrote that conclusion, also said that

2    Officer Rivera had stated that she did give the plaintiff --

3    they give them a plastic shirt type clothing that they have at

4    the police station, and that Miss Williams refused to wear it.

5              THE COURT:  All right.  Thank you, very much.

6              MR. LONDA:  Thank you, your Honor.

7              THE COURT:  All right.

8              MR. SHELTON:  I would ask you to allow me to respond

9    after the other officers.  Our arguments are the same with

10   regard to both officers, otherwise I'd have to make it twice.

11             THE COURT:  All right.

12             MR. ANTONELLI:  Thank you, Judge.  Good afternoon --

13   or good morning.  My name is Danielle Antonelli on behalf of

14   defendant Johanna Rivera, the other officer charged in this

15   case.

16             Judge, I will try not to be repetitive and rely on Mr.

17   Londa's argument which would apply in equal force to Mr.

18   Rivera.

19             There are a couple points I would like to highlight.

20   As we all know, you're duty bound to look at the facts in the

21   light most favorably to the plaintiff.  You're also duty bound

22   to look at the facts not through 20/20 hindsight, but through

23   the eyes of a reasonable officer.  At the point in time -- it's

24   easy and nice here in your Honor's courtroom to judge whether

25   or not certain things should have been done.  We're talking

1   about lasting only two minutes.  We have the Karps, and in

2   particular Mr. Karp and his testimony at one point, Judge,

3   during the ensuing struggle, Mr. and Mrs. Karp removed

4   themselves from the hallway.  And that's because they were

5   concerned for their own safety as to what was taking place.

6         What we have here, Judge, is an incident that lasted

7   two minutes.  We cited to actually two cases.  First, in my

8   moving brief as well as in my reply brief, we cited two cases

9   to point out that, yes, Judge, there was some force here.

10  There was some force, a reasonable amount of force, to overcome

11  Miss Williams' resistance.  And, Judge, what we have here is

12  after attempts were made to try to awake Miss Williams, Mr.

13  Karp testified that she jumped up, and that's when the

14  altercation took place.

15        We also know, Judge, and what's undisputed, is once

16  Miss Williams was handcuffed, there is no allegation that any

17  force was used after the handcuffs were in place because we all

18  know that that was a violation of Miss Williams' constitutional

19  rights.  We also know too that there was no chemical agent used

20  like OC spray.  There was no other weapon used.  A canine was

21  not used, or a service revolver was not used.  And the only

22  thing that was used, that was completed by Rivera, was fist and

23  hands.  And I would submit, Judge, in order to subdued someone

24  who's flailing and kicking their arms, hands and fists maybe

25  used to overcome that resistance.

1         But, Judge, what is interesting, and I think what is

2    most telling about this case, as Mr. Londa pointed out, we do

3    have the Karps' independent testimony, which is actually

4    consistent with the plaintiffs' version of events.  Miss

5    Williams doesn't know how she got to the fifth floor of this

6    apartment building.  The last thing she recalls is being in her

7    apartment.  And, Judge, I quote in my reply pages her

8    testimony, and I think it's important for your Honor's ruling

9    and coming to a conclusion, she testifies:  Now I'm confused,

10   I'm totally disoriented.  And this is at page 4 of my reply

11   brief.  Totally at this point, now, I thought I was in my bed,

12   and someone is picking me up.  There is a woman standing in

13   front of me.  I don't know what's going on.  There is someone

14   in front of me.  What did I do to get you to come here?  Why

15   are you here?  I didn't remember leaving my apartment.  Why are

16   you here?

17         Judge, the plaintiff thought that the officers were in

18   her apartment and wanted something from her, and she's

19   confused.  She doesn't know why.  If you or I, or anyone else,

20   thinks someone's in your bedroom, or in your apartment, or in

21   your house, and you don't know why, you're disoriented, you

22   fight back, you resist, you flail your arms, and you flail your

23   legs.  That's what she did, your Honor.  She tried to get away

24   from people that she thought wanted something from her.  That's

25   important, Judge, because I think it goes to the credibility of

1    Mr. Karp in his testimony.  And, again, that would explain what

2    Mr. Karp saw.  He saw at some point the plaintiff run back to

3    her apartment door and back to the door attempting to try to

4    get in.  At this point she realizes she's not in her apartment

5    and trying to get back into her apartment, it's the Karps'

6    apartment door she was trying to get into.

7            Judge, we think that this case is a case that

8    qualifies -- cries out for qualified immunity, and we would ask

9    your Honor to grant our motion based upon that.

10           THE COURT:  Thank you, very much.

11           Mr. Shelton.

12           MR. SHELTON:  Good afternoon, your Honor.

13           THE COURT:  Good afternoon.

14           MR. SHELTON:  I think he meant to say it's still

15   morning.  It's 11:30.  Good morning.

16           Your Honor, qualified immunity --

17           THE COURT:  Well, do you get to qualified immunity?

18   Don't the facts show that the police were perfectly justified

19   in doing what they did and had to do it?

20           MR. SHELTON:  No, it doesn't.  It doesn't because the

21   arguments that they presented don't present any of the facts

22   that get the police to the point where they should not have

23   been, which is in a confrontation.  Mrs. Williams is a female

24   who is partially unclothed without shoes in a hallway.  The

25   police do not respond to a situation where they believe a crime

1    is being committed.  When they see Mrs. Williams, they don't

2    suspect that there's a crime being committed.  The way that

3    they handled Mrs. Williams in the totality of the circumstances

4    was unreasonable, and we must consider unreasonableness, or the

5    reasonable officer in that situation, in determining whether or

6    not there was any cause for them to do what they did, or

7    whether or not they're entitled to the qualified immunity.

8         Both officers admit that they never considered that

9    she may have been a victim of a crime.

10        THE COURT:  Well, she wasn't.

11        MR. SHELTON:  It doesn't matter.  The reasonable

12   officer coming up on a woman partially clothed does not

13   consider that the woman has committed a crime.  And once they

14   had tried to arouse her, the officers, and I've briefed this,

15   they indicate that they drop her hands several times.  No

16   response.  At that point those officers had a duty to summon

17   EMS.  They didn't.  They continued to treat this woman in an

18   unreasonable fashion.  It is the Karps who I believe both

19   counsel respectively had mischaracterized what the Karps have

20   said in their testimony.

21        They began by giving the woman a sternum rub.  Now,

22   there's no doubt, and it's undisputed based on each of the

23   witnesses, that this woman was naked at the top.  Mr. Karp, at

24   this juncture, you have to take the evidence as it appears,

25   doesn't want to say whether it was the male or female officer

1     that gave the sternum rub.  But we do know that a sternum rub

2     was given to the naked woman's chest.  At that point what Mr.

3     Karp said, he was not supportive of the officers' testimony,

4     and if you recall, the officers' testimony was once that she

5     became aware or conscious from the floor, she began to kick and

6     punch.

7              Officer Dorilus his indicated that he was kicked at

8     least twice in the groin while she was laying on the floor.

9     There is nothing in the testimony of either Karp which supports

10    that.  What the Karps do say is that she jumped up and appeared

11    to be a person who had no control over her function.  They also

12    described what she did as a baby temper tantrum.  I think we

13    all, as reasonable people, know that if a person is having a

14    baby temper tantrum, you don't beat them down.  Babies having a

15    temper tantrum, it's very easy to control.

16             THE COURT:  But she wasn't a baby.

17             MR. SHELTON:  No, she wasn't.  But if she was having a

18    baby temper tantrum, she wasn't --

19             THE COURT:  If a baby grows up and as an adult has a

20    baby tantrum, this baby has grown up.

21             MR. SHELTON:  I don't disagree.  Those actions are not

22    actions that one would consider as being directed towards the

23    officer to cause any injuries to the officer.

24             Now, what I heard from the arguments of counsel, and

25    one thing stood out is that she tried to get away.  Well, if a

1    person is trying to get away, and they're not under arrest,

2    there's no resisting arrest.  None of the testimony of the

3    Karps indicates that she was under arrest.  They never heard

4    the officers identify themselves as officers.  They did not put

5    the handcuffs on her.  And at the time that she allegedly ran

6    back down the hall, she was not handcuffed.

7            THE COURT:  But she was out of control.

8            MR. SHELTON:  I don't know that she was out of

9    control.  We don't belief that she was out of control.  We

10   believe that she was absolutely within her rights at the time

11   because the officers had handled her in an unreasonable

12   fashion.  Specifically I think when you go to the issue about

13   qualified -- let's go back to the malicious prosecution first.

14   If she was not under arrest, breaking away and going back to

15   the door would not have been resisting arrest.  The Karps

16   specifically say that she was not under arrest, and nor was she

17   held by either officer.  So we don't have a situation where the

18   officers have her handcuffed, and have their hands on her under

19   control.  They're walking down the hallway, according to the

20   Karps, at which she turns around, tries knocking and getting

21   into the door.

22           You also don't have one of the other elements of

23   disorderly, which is you're causing some kind of ruckus that

24   is -- that serves no reasonable purpose.  No one in the

25   building, heard it or came to their door.  And specifically one

1      of the things I think the one of the people that were home that

2      night that were interviewed by Sergeant Ospotta, who indicated

3      if someone yelled in the hallway, we absolutely would have

4      heard it, come to see.  We were there and heard nothing.

5              So all of the things that the defense are arguing are

6      in dispute.  And at this stage, which is summary judgment,

7      you're not entitled to anything in their favor.  It's the

8      plaintiff, or the non-moving party who is entitled to have the

9      facts viewed in a light most favorable to them.

10             And in the case of the qualified immunity, the Court

11     has to decide whether the officers' conduct violated a clearly

12     established constitutional right that plaintiff had.  Or

13     whether or not -- well, the Court must also consider, rather,

14     whether or not any of the facts that surround that -- the

15     actions of the officers are disputed.  That is, the historical

16     facts material to what the officers did, have to be objectively

17     looked at to determine whether or not their actions were

18     reasonable.  That gives rise to a jury question.  And here, all

19     of the historical facts are in dispute.  One that is not in

20     dispute, that she was in some state of disarray or not dressed,

21     that she was unconscious or unresponsive.  There is no

22     allegations by either officer that there was any conscious or

23     detectable odor of alcohol.  These are all facts that they're

24     coming with, that they're saying:  Oh, after the fact we found

25     out.

Motion                          17

1          The officer at the scene is the one whose actions

2     we're questioning.  At the scene, none of the issues that I've

3     just discussed, including that she may have been a victim, or

4     that there was some illegal activity going on, or that she was

5     engaged in something that they had to stop when they came upon

6     her.  Those historical facts are all in dispute.  And the --

7     the testimony of the Karps in no way supports the rendition of

8     the facts given by both officers.  Both officers describe an

9     incident where the woman is kicking and punching from the

10    floor.  Mr. Karp specifically says:  I didn't see a fist.  If

11    I'd seen a fist, I would have said punching.

12          And we brought the Court's attention to that, and that

13    would be found in Exhibit A, 4917 through 19.  He also

14    describes that all of her actions were clearly uncoordinated.

15    So the officers were never in any danger.  They weren't

16    escalating violence to another level to subdue this woman.  As

17    a matter of fact, Mr. Karp specifically says at some point when

18    she was flailing, the male officer grabbed her, subdued her,

19    and pinned her on the wall.  Now, historically the plaintiff

20    says that she was grabbed by the hands and pinned on the wall,

21    at which time the female officer began to pummel her.  There's

22    no doubt that the Karps have seen something that supports not

23    only the plaintiff's story but does not support the defendants'

24    story.

25          So in light most favorable to the plaintiff at this

1    stage, how can you decide?  All these historical facts are in

2    dispute.  And any fair -- I have to stress, Judge, any fair

3    reading of the Karps' testimony, no one would say fairly that

4    the Karps' rendition of what happened in that hallway supports

5    anything that the officers said happened in that hallway.  It's

6    completely the opposite, actually.

7             One of the other disputed issues is whether or not

8    there was probable cause for an arrest for disorderly conduct.

9    What was the disorderly conduct?  That's in dispute.  Whether

10   or not she had the capacity to assault or resist arrest, and

11   whether or not there really was a confrontation.  The Karps

12   don't -- they don't describe a confrontation so much as they

13   describe a person who was shocked of consciousness, and who was

14   disoriented.  And in those cases when the officer is not in any

15   danger of immediate bodily harm, they actually were

16   unreasonable in their response.  To hold that woman and to beat

17   her down, breaking her eye socket, causing her ear to bleed,

18   pummeling her about her head, stepping on her foot and leaving

19   a footprint on the naked foot, those are things you would

20   expect for an officer who did not have respect for a rights of

21   a person.  And at this stage it is inappropriate, I believe, to

22   grant summary judgment.

23            I don't believe I need to address the issue of

24   invasion of privacy, unless your Honor has a question.

25            THE COURT:  No, I have the full account in the briefs.

```
 1              MR. SHELTON:  Yes.

 2              THE COURT:  All right.  Any reply?

 3              MR. SHELTON:  Thank you, your Honor.

 4              THE COURT:  Any reply?

 5              MR. LONDA:  I will, your Honor.

 6              Mr. Shelton references injuries.  There was no

 7    permanency.  There were no substantial injuries.  I have to

 8    admit to being a little flabbergasted at his characterization

 9    of the testimony which has been presented in the brief, and you

10    can read that for yourself.  Clearly they didn't say that she

11    was just having a baby temper tantrum.  They said she was

12    windmilling, flailing, and kicking, and striking the officers.

13    Like a baby having a temper tantrum, which was a physical

14    violent reaction by this woman.  And it sounds as if Mr.

15    Shelton's argument is that if you are drunk and under the

16    influence of massive amounts of medication, you can't

17    conscientiously intend to assault a police officer, and

18    therefore the police officer can't be in danger.  And I would

19    suggest that that simply makes no sense.  I can't imagine that

20    anyone, given the testimony read from Mr. Karp, should suggest

21    that there was no disorderly conduct by this plaintiff, and

22    therefore it's malicious prosecution.

23              There is a complete lack of acknowledgement of what

24    happened, even as stated by his own client.  To get this woman

25    under control, who was completely out of control, and the fact
```

1   that the officers did not cause her more injuries, was a

2   testament to their ability not to lose control.  I'm sure your

3   Honor has read the briefs, you've read the Karps' testimony,

4   and you've heard what they had to say.  I submit to you, your

5   Honor, that this is the perfect case where you can rule without

6   any question of fact that these officers conducted themselves

7   in an appropriately, objectively reasonable matter under the

8   circumstances as they occurred at that time.

9          And to argue that maybe they should have thought that

10  something had happened -- and, by the way, in terms of alcohol,

11  Mr. Karp, and I believe it's in my brief, said that they were

12  five or six feet away from her, and they can smell the alcohol.

13  There's never been a question of the alcohol intake.  She

14  acknowledges two glasses of wine, 300 milligrams of Seroquel

15  and two rum and Cokes.  And later she said she didn't finish

16  the second one, all within a fairly short period of time, not

17  having eaten for two days.  Again, your Honor, this must be

18  seen from the vantage of those officers suddenly accosted by

19  this woman, completely out of control and physically violent,

20  and it is just not to say that -- well, maybe they could have

21  done something else.  And I submit, your Honor, that they're

22  entitled to summary judgment, and I thank you very much for

23  your time.

24          THE COURT:  Thank you very much.

25          MR. ANTONELLI:  If I may briefly?

Motion                              21

1         Judge, if I may, your Honor, with all due respect, Mr.

2    Shelton is doing exactly what the case law frowns upon, that is

3    judging the actions of my client and Officer Dorilus in 20/20

4    hindsight.

5         Judge, what we have here is evidence before this Court

6    that the plaintiff was flailing her arms.  This is not the

7    testimony of Officer Rivera, nor is it of Officer Dorilus.

8    This is the testimony of Mr. Karp.

9         On the issue of whether or not the officers were in

10   harm's way, so to speak, the case law talks about not only

11   safety to the other, Mr. and Mrs. Karp retreated to the

12   stairwell to remove themselves from the incident.

13        And, Judge, I know we're talking about qualified

14   immunity, but for a right to be clearly established, Miss

15   Rivera would have had to have known that her conduct on the day

16   in question was unlawful.  And I would submit, Judge, using her

17   hands, her fist and no other weapons of any kind in order to

18   combat someone who is clearly in a situation where she is

19   flailing her arms, does not rise to the level of excessive

20   force in the first instance, which I think your Honor has

21   pointed out.  And secondly, I think you assume, for purposes of

22   this motion, whether or not that right was clearly established.

23   I ask for those witnesses and reasons previously stated, to

24   grant our motion.

25        THE COURT:  All right.  I'll reserve decision and let

Motion                                             22

1      you know.

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25