**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

MICHELLE WILLIAMS,

                Plaintiff,

v.

CITY OF ELIZABETH, et al.,

                Defendants.

Civ. No. 08-5113 (DRD)

**O P I N I O N**

*Appearances:*

by: Fincourt Shelton, Esq.
504 Main Street, Suite 100
Darby, PA 19023

    *Attorney for Plaintiff, Michelle Williams*

LACORTE, BUNDY, VARADY & KINSELLA, ESQS.,
by: Robert F. Varady
989 Bonnel Court
Union, NJ 07083

    *Attorneys for Defendant, City of Elizabeth*

**DEBEVOISE, Senior District Judge**

This matter arises out of the arrest of Plaintiff, Michelle Williams, by Elizabeth Police Officers Johanna Rivera and Rodney Dorilus (the "Officers"). Williams instituted this 42 U.S.C. § 1983 action against the Officers and the City of Elizabeth (the "City") asserting, in general, excessive use of force, invasion of privacy, failure to provide adequate medical treatment, and malicious prosecution. By Order dated September 9, 2010 this court granted summary judgment for the Officers and dismissed all claims against them. Presently before the court are the City's Motion for Summary Judgment and Plaintiff's Cross-Motion for a Continuance pursuant to Rule 56(f).[1] For the reasons set forth below, the City's Motion will be granted and Plaintiff's Amended Complaint will be dismissed with prejudice. Plaintiff's Cross-Motion will be denied.

## I. BACKGROUND[2]

On Sunday morning, November 18, 2007 at 12:15 a.m., the Officers were on duty as uniformed police officers employed by the City. They were dispatched to assist Joshua Karp and his wife Elissa Karp, who are tenants of 801 North Broad Street #5D on the fifth floor of the building.

When the Karps came home late on Saturday night, they found a woman they did not recognize "passed out" in front of the door to their apartment. (Joshua Karp Dep. 34:16, Mar. 11, 2010.). The woman was Williams, the 25-year-old tenant of #8B on the eighth floor of the building. She smelled of alcohol. (Id. 34:23.) Williams appeared to be wearing a pants suit, with the shirt up over her head so she was topless and was not wearing undergarments. She may

---

[1] Rule 56 was amended, effective December 1, 2010, such that the standard governing a motion for a continuance is now contained in sub-section 56(d), not 56(f). Plaintiff's citation to subsection 56(f) was correct at the time the motion was filed. However, for the sake of accuracy, the court will cite to the new sub-section for the remainder of this Opinion and the corresponding Order. It should be noted that the substance of the standard was mostly unchanged.

[2] The facts of this case were detailed in the court's Opinion dated September 9, 2010 (the "September 9th Opinion"). They are repeated here for the sake of completeness and consistency.

have been wearing the suit jacket over the shirt.  She was not wearing shoes.  (Elissa Karp Dep. 7:23-8:16, Mar. 11, 2010.)  The Karps assumed she was "a homeless person that got into the building from the bus stop."  (J. Karp Dep. 14:24-15:3.)  They called the building superintendant but he did not answer so they went down to the lobby of the building and called the police to report a suspicious person.

When the Officers arrived at the scene and the Karps took them upstairs, Williams had not moved.  (J. Karp Dep. 37:8-38:15.)  Rivera touched her shoulder and checked her wrist for vital signs.  (Johanna Rivera Dep. 65:8-20, Nov. 13, 2009.)  The Officers attempted to wake her up by calling to her, "[w]ake up, get up," for about a minute and she did not respond.  (J. Karp Dep. 38:24-39:15.)  Next, Dorilus shook her foot while Rivera touched her hand and tapped on her shoulder.  (Rivera Dep. 66:13-14.)  Williams still did not respond.  (J. Karp Dep. 40:14-21.)

Williams woke up suddenly.  The accounts of the incident offered by Joshua Karp, Elissa Karp, Rivera and Dorilus all concur in describing that as soon as Williams woke up, she began to flail her arms and legs, kick, and yell at the officers.

Joshua Karp observed:  "[s]he jumped up…it appeared to be someone who was highly intoxicated plus probably on a few drugs trying to get up."  (J. Karp Dep. 43:12-19.)  She started "[s]winging [her arms], [in a] windmill motion" and "kick[ing] her legs, like a baby temper tantrum."  (Id.  49:16-23.) The Karps retreated to the stairwell, which was "very close," about "two doors from their apartment" for protection and observed the scene from there.  (Id. 13:14-15; 14:17-22.)  Elissa Karp observed that "[Williams] was running back and forth to our apartment door trying to open the door.  At that point they were just holding her to try to stabilize her."  (E. Karp Dep. 12:9-14.)  "She was resisting them, flailing her arms and legs, and he pinned her against the wall holding her arms down to prevent her from hitting him."  (J. Karp Dep.

3

19:17-20.) The Officers informed Williams that she "had to come, she didn't live here." (J. Karp Dep. 13:13-14.) When "the officers told her that she had to leave [] she tried banging on the [Karps' apartment] door." (J. Karp Dep. 13:11-12.) "She was [] shouting and screaming for a whole bunch of the time." The only word Joshua Karp could make out that she said was "bitch." (Id. 31:17-24.) It appeared to Joshua Karp that Williams was "attacking" the Officers. (Id. 51:12.) Joshua Karp testified that he did not see either Officer hit Williams, but he did see her kick and hit them. (20:10-16.) "She got it together somewhat to where she was able to walk without the officers forcing her to walk. Once they let go of her, she ran back to the door and started ringing the doorbell that we had and smashing on the door." (J. Karp Dep. 14:12-16.)

According to Dorilus, "when she finally turned over…she attacked us." (Rodney Dorilus Dep. 73:15-16, Nov. 9, 2009.) "We were never able to help this lady in any way….[s]he started kicking, punching, fighting. When she turned over, it was a fight that we didn't expect." (Id. 75:17-24.) Rivera stated in the police report, "we advised Ms. Williams to calm down…or she would be placed under arrest for disorderly conduct." (Antonelli Cert. App. B.) At some point, she kicked him in the groin and punched Rivera. (Dorilus Dep. 76:7-8; Antonelli Cert. App. B.) Rivera stated that she was "combative" and "began kicking and punching myself and my partner" and "flailing." (Johanna Rivera Dep. 77:20-78:19.) Dorilus recalls:

> I think she tried to stand up. I don't remember exactly. I think she was trying to get up. It was a fight and she was trying to get away from us, I believe….She was fighting, constantly fighting, kicking, crawling, trying to bite. She was acting like a crazy woman.

(Dorilus Dep. 96:16-22.)

When the Officers advised Williams that she was under arrest, she continued to fight and kick. (Id. 97:5-10.) While they were attempting to arrest her, Williams repeatedly tried to stand

4

up, and they "took her back down." (Id. 97:17-98:4.) Dorilus struck Williams "to get her under control." (Id. 99:22-23.) Dorilus stated,

> She might have got struck in the face. That wasn't the intended target. I threw punches. I wasn't intending to hit her in the face, but she might have got struck in the face.

(Id. 101:19-22.)

Rivera also testified that she struck Williams with her hands during the struggle. (Rivera Dep. 81:16-25.) Dorilus testified, "[w]e tried compliance holds with her, that didn't work. We tried pressure points, that didn't work." (Dorilus Dep. 99:23-25; see also Rivera Dep. 80:1-2.) Dorilus described the struggle with Williams as "fierce" and "violent," and said that during the struggle, Williams was "loud and profane." In the end, the Officers together were able to put handcuffs on Williams. (Id. 102:17-103:22.) Rivera's police report stated, "after a brief struggle we were able to complete the handcuff procedure." (Antonelli Cert. App. B.) To do so, they had to force her arms behind her back. (Dorilus Dep. 100:14-15.) When they escorted her to the elevator, they had to help her walk. (Rivera Dep. 81:5-6; Michelle Williams Dep. 98:5-6, Oct. 23, 2009.) The Officers completed a "use of force report," which stated that Williams had resisted police officer control and posed a "physical threat/attack" on a police officer. The report states that the Officers used a compliance hold and hands/fists. (Antonelli Cert. App. C.)

Williams's story differs from the accounts of the Officers and the Karps, mostly in that she does not recall kicking, flailing or yelling at the Officers. On Saturday, November 17, 2007, between about 6:00 p.m. and 9:00 p.m., Williams drank two glasses of wine and took about 300 milligrams of Seroquel, a sedative.[3] Williams had not eaten for two days. Around 9:00 p.m., she went downstairs to visit an acquaintance who lived on the fifth floor. She drank one or two rum

---

[3] Williams was also taking an antidepressant and a mood stabilizer at the time. Williams's prescribed dosage of Seroquel was apparently less than 150 milligrams. (See Williams Dep. 68:14-69:16.)

5

and coca-cola mixed drinks with him. After about an hour, she began to feel disoriented, "[l]ike everything was spinning," and felt "[r]eally heavy and lethargic." (Michelle Williams Dep. 77:18-21, 79:15-16, Oct. 23, 2009.) Williams has no memory of how she left the acquaintance's apartment. (Id. 78:23-25.) Williams does recall getting ready for bed in her apartment and going to sleep there. (Id. 81:22-24.) When the Officers woke her up in the hallway in front of the Karps' apartment door, she thought she was still in her bed. The first thing she remembered was "being nudged, like someone hitting my left side of my body and hearing voices." (Id. 83:15-16.) She felt confused and disoriented and did not understand what the people "want[ed] from her," or that they were police officers. (Id. 91:11-22.) She recalls being lifted "up off my bed" and "brought to my feet." (Id. 88:2-16.) Her vision was "in and out" during the incident. (Id. 89:16-17.) Once she was brought to her feet, she was "knocked down because [she] was hit" near her "ear or [her] head." (Id. 91:4-6, 96:7.) Williams testified that, "I thought that it was [the female officer's] fist [that hit me], but I didn't see her fist, I just felt it." (Id. 97:5-6.) Williams testified that the "hitting" lasted for about two minutes. (Id. 97:16.) When asked whether she remembers kicking or striking the Officers, Wiliams answered "no," and "no, I do not remember." (107:13-108:4.) Williams did not have any identification with her and she does not remember telling the officers that she lived in the building. (102:13-19.) Williams does not appear to contend that the Officers used any improper force after they handcuffed her and when they escorted her out of the building and into the police car.

There is some dispute as to how Williams was dressed when she was found and arrested. Elissa Karp observed that Williams appeared to be wearing a pants suit, with "her shirt over her head so she was topless, and she was wearing pants…she was wearing the jacket and the shirt that was underneath was over her face." (E. Karp Dep. 7:23-8:16.) Joshua Karp concurs with

6

his wife in that he described Williams as "topless" several times over the course of his deposition. Dorilus remembers that when they arrested her, Williams was wearing a shirt, but it was partially ripped and partially on her body. (Dorilus Dep. 128:11-12.) Rivera basically agrees.

When Williams arrived at the station, she remembers that she could see herself and she was wearing "a black pea coat and pin-striped suit pants." (Williams Dep. 102:23-103:5.) Williams stated that the pea coat "had to be 'checked in' although it was [her] only possession; literally the clothes off my back and it was hung up with a ticket and put with the cell phones and other peoples [sic] possessions." Once at the police station, Williams does not believe that Dorilus and Rivera remained in the processing area with her. (Id. 104:23-105:1.) According to her deposition, she was fingerprinted right after being brought to the station—before she was placed in the cellblock. (Id. 104:3-19.) While she was being fingerprinted, another female officer took her to put a "piece of plastic on me." (Id. 109:9-13.) It was a Tyvek shirt with sleeves. (Id. 114:10-12.)

At the station, one of the Officers called EMS because Williams complained of pain. (Dorilus Dep. 131:23-132:20.) The Amended Complaint alleges that Williams suffered an injured right eye socket, ear hemorrhaging, and bruising and lacerations about her head, body, and feet. (Am. Compl. ¶ 27.)

Rivera signed a complaint against Williams charging her with disorderly conduct, N.J. Stat. Ann. 2C:33-2, assault on police, N.J. Stat. Ann. 2C:12-1(b)(5)(A), and resisting arrest, N.J. Stat. Ann. 2C:29-2(a). Dorilus signed a complaint against Williams for assault on police. The charges were dismissed because the Officers did not appear in court.

The Amended Complaint was filed on April 21, 2010 after the parties had engaged in substantial discovery. Williams asserts five causes of action in the Amended Complaint. Count One asserts a § 1983 claim for municipal liability on the part of the City for negligent training and supervision. Count Two is a § 1983 claim against the Officers for excessive force in violation of the Fourth and Fourteenth Amendment. Count Three asserts a cause of action against the City for invasion of privacy in violation of Williams's Fourth Amendment rights. Count Four is a § 1983 claim against the City for failure to provide medical services. Count Five is a common law claim for malicious prosecution against the Officers.

## II.  DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

**A.    Standard of Review**

Summary judgment is proper where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). For an issue to be genuine, there must be "a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party." Kaucher v. County of Bucks, 455 F.3d 418, 423 (3d Cir. 2006). For a fact to be material, it must have the ability to "affect the outcome of the suit under governing law." Id. Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment.

The party moving for summary judgment has the burden of showing that no genuine issue of material fact exists. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). When the moving party does not bear the burden of proof at trial, the moving party may discharge its burden by showing that there is an absence of evidence to support the non-moving party's case. Id. at 325. If the moving party can make such a showing, then the burden shifts to the non-moving party to present evidence that a genuine fact issue exists and a trial is necessary. Id. at

324. In meeting its burden, the non-moving party must offer specific facts that establish a material dispute, not simply create "some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). In deciding whether an issue of material fact exists, the Court must consider all facts and their reasonable inferences in the light most favorable to the non-moving party. See Pa. Coal Ass'n v. Babbitt, 63 F.3d 231, 236 (3d Cir. 1995). The Court's function, however, is not to weigh the evidence and rule on the truth of the matter, but rather to determine whether there is a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). If there are no issues that require a trial, then judgment as a matter of law is appropriate. Id. at 251-52.

**B.    Plaintiff's Amended Complaint**

**Count One** of the Amended Complaint alleges that the City, as a matter of policy and practice, has been deliberately indifferent to the need to adequately train its police officers with regard to the use of force that can be used during an arrest, and that the City has tolerated a custom and practice of excessive use of force by police officers.

The court already ruled in the September 9th Opinion that the Officers did not use excessive force when they arrested Plaintiff. Without an underlying constitutional violation, Plaintiff cannot sustain a cause of action against the City for any alleged failure to train and supervise its officers with regard to the amount of force used during the arrest because she did not experience any excessive force. Thus, summary judgment will be granted with respect to Count One.

**Count Two** alleges that the Officers assaulted Williams. As stated in the September 9th Opinion, Count Two does not appear to state a cause of action against the City. Nonetheless, to

the extent Count Two asserts a claim against the City, summary judgment is appropriate for the same reasons it is appropriate with respect to Count One.

**Count Three** alleges that Plaintiff was arrested and detained in a semi-nude state. (Am. Compl. ¶ 41.) Plaintiff alleges that this violated her constitutional rights because she "had a reasonable expectation not to be observed unclothed or to have her private parts observed by others." (Id. ¶ 41.) She asserts this claim against the City for failing, as a matter of policy and practice, to adequately train its police officers to provide arrestees with sufficient body coverage.

Although there is some dispute as to what Plaintiff was wearing when the Karp's found her lying unconscious on the hallway floor, it is undisputed that she was in a semi-nude state. It is also undisputed that she was wearing a pea coat and pants when she arrived at the police station. Plaintiff testified that when the Officers took her to the police station she was wearing a black pea coat that covered her upper body and pin-striped pants on her lower body. Thus, although Plaintiff may have been partially undressed during the violent struggle leading up to her arrest, it is clear that the Officers covered her up once she was subdued and before she was taken into the police station.

Upon arriving at the police station someone made her check the pea coat as a personal item but a female officer gave her a Tyvek suit shortly thereafter. Plaintiff testified that a female officer gave her a "plastic" shirt right after being brought to the station, while she was being fingerprinted. This occurred before her mug-shot was taken and before she was brought to the cellblock. These facts, all of which are derived from Williams's own testimony, belie her assertion that she was forced to remain topless longer than reasonably necessary.

Even if Plaintiff could demonstrate that an individual officer acted unreasonably, to sustain a cause of action against the City she would need to show that the officer's actions were

the result of the City's failure to properly train said officer.  Plaintiff has failed to produce any evidence in that regard.  Finally, it should be noted that Plaintiff does not address this Count in her opposition papers.  Thus, for all of the foregoing reasons, summary judgment will be granted with respect to Count Three.

**Count Four** alleges that the City has failed to train its police officers with respect to providing medical care to people in police custody.  In the September 9th Opinion the court found the following:

> It is uncontested that when Williams complained of pain at the police station, either Dorilus or Rivera called for Emergency Medical Services ("EMS").  Rivera saw the medical personnel interacting with Williams but she was not involved in the conversation.  Later, she wrote in her police report that "EMS-6 was notified and responded to the cellblock where Ms. Williams refused medical attention."  During her deposition, Rivera stated that EMS informed her that Williams refused medical attention.

Thus, no reasonable jury could conclude that Plaintiff was not provided with proper medical care or that the City failed to train its police officers with respect to providing medical care.  Summary judgment will be granted with respect to Count Four.

**Count Five** alleged a malicious prosecution claim against the Officers.  In granting summary judgment to the Officers, the September 9th Opinion concluded that the "only claims that remain in this case are Counts One, Three, Four, and Five against the City of Elizabeth."  But Count Five does not appear to assert a claim against the City and Plaintiff states in her sur-reply brief that "[P]laintiff has never asserted a claim against the City of Elizabeth for malicious prosecution . . . ."  Thus, summary judgment will be granted with respect to Count Five.

### III.  PLAINTIFF'S CROSS-MOTION FOR CONTINUANCE

Plaintiff filed a Cross-Motion for a Continuance to allow additional discovery pursuant to Rule 56(d).  However, it is clear from the above facts that Plaintiff's claims are totally lacking in

11

merit. The record already shows that summary is warranted. Allowing Plaintiff to conduct additional discovery would be futile. Thus, Plaintiff's Cross-Motion for Continuance will be denied as moot.

### IV.  CONCLUSION

For the reasons set forth above, the City's Motion for Summary Judgment will be granted and Plaintiff's Amended Complaint will be dismissed with prejudice. Plaintiff's Motion for a Continuance will be denied. The Court will enter an order implementing this opinion.


                                        s/ Dickinson R. Debevoise
                                        DICKINSON R. DEBEVOISE, U.S.S.D.J.

Dated: December 10, 2010